1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

UNITED STATES OF AMERICA,                    )
                                             )
                        Plaintiff,           )        Case No.   2:09-mj-516-GWF
                                             )
vs.                                          )        **ORDER**
                                             )
SHAUN P. SHAWDA,                             )
                                             )
                        Defendants.          )
_____    )

        This matter is before the Court on the Government's Petition for Warrant for Offender Under Supervision (#20), filed on May 18, 2010.  Defendant Shaun P. Shawda was arrested on the warrant issued pursuant to the petition on May 28, 2010.  He made his initial appearance before the Court on June 1, 2010 at which time he was detained pending the revocation hearing.  The revocation hearing in this matter was originally scheduled for June 21, 2010.  The Court continued the hearing at the Government's request so that it could obtain additional evidence in support of the petition.  The Court conducted the revocation hearing on June 28, 2010.

## BACKGROUND

        Defendant Shaun P. Shawda was charged in Count One of the Complaint filed on June 29, 2009 with operating a motor vehicle while under the influence of alcohol in violation of 36 C.F.R. § 4.23(a)(1).  Defendant made his initial court appearance on June 29, 2009 at which time he pled not guilty and was released from custody subject to pretrial supervision.  The pretrial release conditions required Defendant to refrain from any use of alcohol and to submit to remote alcohol testing.  *Appearance and Compliance Bond (#6)*, p. 4.  On November 18, 2009, Defendant pled guilty to Count One of the Complaint and the matter was referred to the United States Probation Office for a presentence report.  Defendant's sentencing was scheduled for February 10, 2010.  On November

1   20, 2009, the Court granted Defendant's motion to modify his pretrial release condition to remove

2   the requirement for remote alcohol testing and permit Defendant to be subject to drug and alcohol

3   testing at the Pretrial Services Office. *Order (#12).*

4   On January 27, 2010, the Court received the Probation Office's presentence report which

5   stated that Defendant had prior driving under the influence of alcohol convictions in 1981, 1992 and

6   2001. The charges in the 1981 and 2001 also included charges of hit and run with property damage.

7   According to the presentence report, Defendant Shawda spoke candidly about his history with

8   alcohol and expressed his desire to remain sober. The Probation Office recommended that

9   Defendant be placed on 3 years probation with conditions. The Court followed the Probation

10  Office's recommendation and sentenced Defendant Shawda to probation for a term of 36 months.

11  The probation conditions imposed by the Court include the mandatory requirement that Defendant

12  not unlawfully possess or use controlled substances and that he submit to drug and alcohol testing

13  by the probation office. *Judgment in a Criminal Case (#16)*, p. 3. Special Condition No. 3 also

14  requires Defendant to participate in and successfully complete a substance abuse and/or cognitive

15  based life skills program which will include drug/alcohol testing and/or outpatient counseling as

16  directed by the probation office. The conditions also required that Defendant refrain from the use

17  and possession of beer, wine, liquor, and other forms of intoxicants while participating in substance

18  abuse treatment. *Judgment in a Criminal Case (#16)*, p 4.

19  On May 18, 2010, the Government moved to revoke Defendant's probation for alleged

20  violations of Special Condition No. 3. The petition alleges that Defendant failed to report for drug

21  testing on March 13, 2010, March 30, 2010, April 1, 2010, April 10, 2010, April 11, 2010, April 12,

22  2010 and April 14, 2010. It further alleged that Defendant tested positive for marijuana on March

23  11, 2010, March 16, 2010, April 15, 2010, April 17, 2010, and April 22, 2010. The petition alleged

24  that Defendant also tested positive for marijuana on April 28, 2010, but that the probation office

25  was awaiting confirmation on that test.

26  The sole witness to testify for the Government at the revocation hearing was United States

27  Probation Officer Crystal Johnson. In regard to the allegation that Defendant failed to report for

28  drug testing on seven dates, Ms. Johnson testified that Defendant actually reported to the half-way

2

house for urine testing on most of the alleged dates, but that he was a "stall," meaning that he claimed he was unable to provide a urine sample after attempting to do so. Ms. Johnson testified that "stalls" are treated as failures to report for drug testing. Ms. Johnson further testified that pursuant to the Probation Office's and the half-way house's regular practice, an adult male officer or counselor was present in the restroom when Defendant was to provide the urine sample to ensure that Defendant did not use any device to provide a counterfeit sample or introduce any substance into the urine sample to create a false negative test result. As the petition alleges, there were two days in March, the 11th and 16th, and four dates in April, the 15th, 17th, 22nd and 28th, when Defendant did provide urine samples which were allegedly positive for marijuana.

Defendant Shawda testified that there was only one date that he actually missed a drug testing appointment and he made up for that on the following day. Mr. Shawda testified that he did not intentionally refuse or avoid providing urine samples on the other dates charged in the petition. He testified that he was sexually molested as a child by an adult male and that it was difficult for him to provide a urine sample while a male adult was in close proximity observing him urinate.

Officer Johnson testified that during an April 15, 2010 meeting with Defendant Shawda to discuss the positive drug tests, he admitted that he used marijuana in December 2009, but adamantly denied any use of marijuana after that date. Officer Johnson testified that following his arrest on May 28, 2010, Defendant was again questioned about his marijuana use, but this time stated that he last used marijuana two days before his sentencing hearing on February 10, 2010.

The Court conditionally admitted over Defendant's hearsay objections the drug test reports from Kroll Laboratory for the drug tests conducted on the urine samples collected on March 10 and 16, 2010, and April 15, 17, and 22, 2008 which were reported positive for marijuana metabolite. *Government Exhibits 1A-1E.* Although the petition alleged that a urine sample obtained on April 28, 2010 also initially appeared positive, the drug laboratory subsequently reported that it was negative. The Court also conditionally admitted a June 28, 2010 report by Pat Pizzo, the Director of Toxicology for Alere Toxicology Services of Gretna, Louisiana (hereinafter the "Alere" report). *Government's Exhibit "2".* The Alere report is dated the same day as the revocation hearing and

3

1    was made available to Defendant's counsel shortly before the hearing commenced.[1]

2        The Alere report states that marijuana is stored in the body longer than many other drugs

3    and that, depending upon the type of use of the drug, the length of time it can stay in the body can

4    fluctuate.  A chronic user, meaning a person who uses the drug several times a day every day, may

5    continue to release the drug into the urine for up to six weeks.  An occasional user, "meaning an

6    individual who smokes a couple of puffs over the weekend," will eliminate the drug in less than a

7    week.  The report states that "elimination of drug is expressed in terms of a half-life, which is the

8    length of time it takes for half of the drug to be eliminated.  The average half-life for marijuana is

9    24 to 48 hours for an occasional user and 48 to 72 hours for a chronic user." *Government's Exhibit*

10   *"2"*, p. 1.  The report further states that "[w]hen evaluating specimens close in time, urine

11   concentration is a factor which can complicate the interpretation.  As urine concentration fluctuates,

12   drug level fluctuates; therefore, correction for the dilution of concentration is called a creatinine

13   normalization procedure.  A random urine creatinine should be in the range of 100 to 200 mg/dl

14   with an average of approximately 170 mg/dl.  To compensate for the dilution effect, the drug

15   concentrations are normalized and reported as nanogram of drug per milligram of creatinine."  The

16   report then listed the results of the analysis of the urine samples or specimens submitted for analysis

17   by Alere.  *Id.*

18       The report further states:

19            Officer Henry Stegman [another Probation Officer] provided
             information that the offender was a moderate user of marijuana.  In
20            the October 2008 issue of the *Journal of Analytical Toxicology*, Dr.
             Huestis et.al. published data on the clearance of THCA in the urine of
21            users ranging from social to chronic.  Test subjects admitted to the
             study with a normalized THCA value of greater than 150 ng/mg
22            cleared the THCA in a mean of 15.4 days [plus or minus] 9.8 days
             and a maximum of 29.8 days.  The time period from 3/10/10 to
23            4/15/10 is 36 days.  It is my opinion that the offender reused
             marijuana prior to the collection on April 15, 2010.  I base this
24            opinion on moderate use, the length of time the offender continues to

25   _____

26       [1] The Court granted the Government a one week extension of the hearing on June 21, 2010
     so that it could obtain the "test kits" for the drug tests or other evidence to verify that Defendant
27   tested positive for drug use.  The Government did not produce or introduce the drug test kits, but
     instead introduced the reports of the drug test results and the Alere report analyzing those results.
28

4

test positive, the lack of significant decrease in the normalized level of drug present in the urine specimen collected on 4/15/10, and a urine half-life of 48 hours.

The results of the specimen collected on 3/16/10 and 4/22/10 are inconclusive, and I am unable to determine if this is new use or residual elimination.

*Government's Exhibit "2"*, p. 1.

Defendant Shawda testified that he used marijuana on a daily basis from the time he was 17 years old until he stopped using it prior to the sentencing hearing--a period of 35 years. He stated that he used marijuana to relieve an eye condition that he has suffered from since childhood. Defendant testified that he was aware prior to the sentencing hearing that he would be prohibited from possessing or using illegal controlled substances and would be required to submit to drug testing. He acknowledged that he initially told the probation officer that he stopped using marijuana in December 2009, but at the time he made that statement he thought that the sentencing hearing had occurred in early January 2010. He testified that he, in fact, last used marijuana two days before the sentencing hearing, i.e., on or about February 8, 2010. Defendant admitted on cross-examination that prior to February 10, 2010, he was on pretrial supervision and was also prohibited by the conditions of his pretrial release from illegally possessing or using controlled substances.

## DISCUSSION

The Defendant objected to the admission of the laboratory drug test results and the Alere report on the grounds that they are hearsay and, if admitted, Defendant's counsel would be deprived of the opportunity to cross-examine the lab technicians and the author of the Alere report. Defendant's counsel also argued that Officer Johnson was not qualified to interpret the test results or the opinions expressed in the Alere report. The Government's counsel argued that hearsay evidence is admissible in a revocation hearing and that the Court can and should consider the drug test results and the Alere report in deciding whether Defendant Shawda used marijuana in violation of his conditions of probation. The Court stated that it would review the law regarding the admissibility of such evidence and issue a decision on their ultimate admissibility.

. . .

5

1   A district court may revoke of a term of supervised release or probation only if it "'finds by

2   a preponderance of the evidence that the defendant violated a condition of supervised release.'"

3   *United States v. Perez*, 526 F.3d 543, 547 (2008), citing 18 U.S.C. §3583(e)(3) and *Morrissey v.*

4   *Brewer*, 408 U.S. 471, 484, 92 S.Ct. 2593 (1972).  Although this is a lower standard than that

5   required for a criminal conviction, there must still be credible evidence that the defendant actually

6   violated the terms of his supervised release or probation.  *Id.*

7   In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004), the Supreme Court held

8   that the Sixth Amendment's Confrontation Clause gives criminal defendants the right to confront

9   "testimonial" witnesses.  The Ninth Circuit has held, however, that the Sixth Amendment

10   confrontation clause and the *Crawford* decision do not apply to supervised release or probation

11   revocation proceedings.  *United States v. Hall*, 419 F.3d 980, 985-86 (9th Cir. 2005).  The court

12   relied on *Morrissey v. Brewer* in holding that revocation of supervised release or probation is not

13   part of a criminal prosecution and that the full panoply of rights due a defendant in a criminal trial

14   do not apply to revocation hearings.  A defendant, however, has a more limited due process right to

15   confront adverse witnesses during a revocation hearing.  *Hall* states that "'[u]nder *Morrissey*, every

16   releasee is guaranteed the right to confront and cross-examine adverse witnesses at a revocation

17   hearing unless the government shows good cause for not producing the witnesses.' [*United States v.*

18   *Comito*, 177 F.3d 1166 (9th Cir. 1999)]."  In determining whether the admission of hearsay evidence

19   violates the defendant's right of confrontation in a particular case, the court must weigh the

20   defendant's interest in his constitutionally guaranteed right to confrontation against the

21   Government's good cause for denying it.  The court further states that "[t]he weight to be given the

22   right to confrontation  ... depends on two primary factors: the importance of the hearsay evidence to

23   the court's ultimate finding and the nature of the facts to be proven by the hearsay evidence."  *Hall*,

24   419 F.3d at 986.

25   In *United States v. Martin*, 984 F.2d 308 (9th Cir. 1993), the district court revoked

26   defendant's supervised release and imposed an enhanced prison sentence based on defendant's

27   possession of controlled substances.  The only evidence supporting the finding of possession of a

28   controlled substance consisted of two laboratory urinalysis reports showing the presence of

6

methadone and cocaine metabolites.  Although the local drug counselor who collected the urine

samples testified to the test results, the government presented no other witness.  The counselor was

unable on cross-examination to testify about the particular tests employed on the samples or the

testing laboratory's general testing and handling procedures.  The counselor testified, however, that

the samples were still available for testing.  Although defendant's counsel requested additional time

to conduct independent testing on the samples, the district court refused.   In holding that the

defendant's due process right to confront the witnesses against him was violated, the court stated:

> Here, the laboratory results were uniquely important to the court's
> finding that Martin possessed a controlled substance.  Martin denied
> using cocaine, and the government presented no other evidence of
> cocaine use, much less possession.  Thus, Martin had a very strong
> interest in refuting the laboratory results upon which the district court
> exclusively relied in finding possession.
>
> Despite this strong interest, Martin had virtually no opportunity to
> refute the test results.  This nearly complete denial of *any*
> confrontation is the second factor contributing to our conclusion that
> Martin's right weighs heavily in the *Simmons* balance.  That this
> factor  is an appropriate consideration follows from the *Morrissey*
> flexibility principle as well as our own cases emphasizing
> "prejudice."  *See, e.g., Standlee v. Rhay*, 557 F.2d 1303, 1307-08 (9[th]
> Cir. 1977) (parolee must show absence of procedural safeguard was
> prejudicial.)  Had Martin been given some opportunity-even if not the
> traditional opportunity to cross-examine a live witness-to refute this
> important evidence, then that opportunity could be considered in
> partial mitigation of his right to confrontation.  No such partial
> opportunity was here afforded.

*Martin*, 984 F.2d at 311-12.

     The court also based its decision on the fact that the district court was required to impose an

enhanced sentence once it found that defendant was in possession of controlled substances.

      As to whether the government had good cause for not producing the lab technician, the

court noted that its prior decisions look to both the difficulty and expense of procuring witnesses

and the "traditional indicia of reliability borne by the evidence."  *Martin*, 984 F.2d at 312-13.  The

court dismissed the difficulty and expense of producing the lab technician(s) as carrying little

weight because the government provided absolutely no substitute for their live testimony, such as

affidavits, depositions or documentary evidence.  The court recognized that the test result reports

were entitled to some weight because they were regular reports of a company whose business it is to

1  conduct such tests and which expects its clients to act on the basis of its reports.  The government,

2  however, provided only negligible information about the lab's experience or qualifications in drug

3  testing.  The general reliability of such reports, therefore, was not sufficient to outweigh defendant's

4  right to cross-examine the lab technician where he disputed the finding that he had used cocaine.

5        In *United States v. Perez*, 526 F.3d 543 (9th Cir. 2008), the court also held that the defendant

6  had the right to cross-examine the lab technician who tested a urine sample that contained an illegal

7  drug.  The court cautioned, however, that the case was unusual, with unusual facts, and should not

8  be taken out of context.  The court stated that it was not holding that a releasee always has a right to

9  cross-examine the technician who tested a urine sample.  In that regard, the court stated:

> 10  This is not a case where other evidence was offered in support of
>      revocation, such as illegal drugs discovered in the possession of the
> 11  releasee.  Nor is this a case where multiple urine samples each tested
>      positive.  Here, the urinalysis report was the critical piece of evidence
> 12  presented in support of the charge that Perez tested positive for
>      cocaine.  Although urinalysis results may often be sufficiently reliable
> 13  evidence that the opportunity for cross-examination is unnecessary
>      for due process purposes, *see United States v. Martin*, 984 F.2d 308,
> 14  313-14 (9th Cir. 1993), here the report itself showed the sample to
>      have been adulterated.  Given that the sample was uncontestably
> 15  adulterated, the test results were in fact ineluctably *un* reliable.

16  *Perez*, 526 F.3d at 545.

17        The Court will not discuss all of the facts in *Perez* which raised legitimate questions about

18  the validity of the drug test result.  Among those facts, however, was testimony by the contract

19  supervising officer that the testing method used by the contractor was not always reliable and that

20  test strips which initially indicated a positive drug result, turned out negative when they were

21  subsequently analyzed at the laboratory.

22        Although, as *Martin* and *Perez* indicate, issues may arise in a particular case regarding the

23  validity of drug test results, such drug tests involve the application of routine scientific procedures

24  to a given urine sample to determine and report the presence of a drug – in this case marijuana

25  metabolite.  So long as the proper procedures and protocols are followed, the results are generally

26  reliable and likely to be admitted and accepted as valid by the court.  In this case, there was one

27  urine sample obtained on April 28, 2010 that initially tested positive, but that was subsequently

28  determined to be negative upon analysis by the laboratory.  The other drug test results were positive

1    and there is nothing in the record to indicate that these tests were adulterated and inherently

2    unreliable.  The Government did not, however, submit any declarations by the Kroll scientists

3    describing the chain of custody and testing procedures which would provide further indicia of the

4    tests' reliability.  *See Martin*, 984 F.2d at 1313.  Under *Martin* and *Perez*, it is probably debatable

5    whether the Kroll drug test reports should be admitted over Defendant's hearsay objection.

6         Even assuming that the Kroll Laboratory drug test reports are admissible over Defendant's

7    hearsay objection, the Court cannot reach the same conclusion in regard to the Alere report.  The

8    Alere report contains the type of expert opinion testimony that classically lends itself to challenge

9    through cross-examination of the expert.  Mr. Pizzo does not simply report the results of scientific

10   test procedures.  Instead, he provides an expert evaluation of the drug test results and other

11   information about Defendant's alleged marijuana use in opining that he used marijuana between

12   March 10 and April 15.  In so doing, Mr. Pizzo considered the variable nature of marijuana use and

13   how long it takes for marijuana to be eliminated from the body.  He noted in particular, that in the

14   case of a chronic marijuana user, marijuana may continue to be released in the urine for up to six

15   weeks after the last use.  Mr. Pizzo evaluated the test results for each urine sample in comparison to

16   each other.  He also based his opinion on information provided to him by Probation Officer

17   Stegman that Defendant Shawda "was a moderate user of marijuana."  The term "moderate user" is

18   not defined in the report, although it presumably lies somewhere between an occasional user and a

19   chronic user.  Mr. Stegman did not testify at the hearing and it is unknown on what basis he

20   considered Defendant Shawda to be a moderate marijuana user.  It is, of course, conceivable that

21   Mr. Pizzo's opinions are valid and based on sound facts and scientific principles.  Without the

22   opportunity for cross-examination, however, Defendant has no means to challenge and test the

23   validity Mr. Pizzo's opinions or his competency to render such opinions.[2]

24        The probation officer was aware on April 15, 2010 that Mr. Shawda denied using marijuana

25   after he was placed on probation.  Although Mr. Shawda told her on that date that he last used

26

27

28        [2] The Government did not provide a declaration by Mr. Pizzo or a copy of his curriculum
     vitae regarding his qualifications to render the expert opinions in the report.

marijuana in December, 2009, he subsequently informed her that he last used marijuana two days before his sentencing hearing on February 10, 2010.  Mr. Shawda adamantly denied using marijuana after that date.  The Government was therefore on notice well before the revocation hearing that Defendant denied the allegation that he used marijuana during probation and disputed the positive drug tests.  On June 21, 2010, the Government requested a continuance of the hearing so that it could obtain the drug "test kits" to confirm the validity of the drug test results.  The Government did not state that it intended to obtain an expert opinion report to establish that Defendant used marijuana after February 10, 2010.  The Alere report was not provided to Defendant until the morning of the hearing on June 28, 2010.  These additional circumstances support the conclusion that it would be fundamentally unfair to admit the Alere report over the Defendant's hearsay objection, thereby depriving him of an opportunity to cross-examine Mr. Pizzo or to even seek a rebuttal report from another expert.  *See Martin*, *supra*.[3]

Based on Mr. Pizzo's opinions, it is unlikely that Defendant Shawda would have tested positive for marijuana more than 9 weeks after he allegedly ceased using marijuana.  Without those opinions, however, the Government has not meet its burden of proving that Mr. Shawda used marijuana after February 10, 2010 based solely on the positive drug test results. With or without the Alere report, the Court also cannot determine on how many occasions Mr. Shawda used marijuana because a single ingestion of marijuana could result in multiple positive drug test results.  The number of occasions, if any, that Mr. Shawda used marijuana in violation of his probation is a factor in determining whether his probation should be revoked and, if so, the term of imprisonment that should be imposed if his probation is revoked.  Because of the importance of the Alere report to the ultimate decision on the petition, the Court holds that Defendant's counsel was entitled to an opportunity to cross-examine the author of that report.  The Court, therefore, holds that the Alere report is inadmissible.

. . .

_____

[3] Defendant's counsel did not request time to seek an opinion from another expert.  Mr. Shawda has been in custody since June 1, however, and it would be unfair to further delay the hearing based on the Government's belated disclosure and introduction of an expert opinion report.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The issue remains whether Mr. Shawda violated the conditions of probation by "failing to report for drug testing." The evidence whether Mr. Shawda intentionally "stalled" giving urine samples is debatable. On the one hand, he was unable or unwilling to provide urine samples on March 13 and 30, and April 1, 10, 11, 12 and 14. On the other hand, he provided urine samples, which tested positive, on March 11 and 16, and April 15, 17, and 22. He also provided another sample on April 28, which was ultimately found negative. Mr. Shawda had an explanation for why he could not provide urine samples on the dates charged in the petition -- his difficulty urinating in the presence of an adult male due his childhood experience. While Mr. Shawda had a motive to evade giving urine samples, it seems likely that he would have avoided giving any samples, especially after he initially tested positive, if he was simply trying to avoid disclosing his ongoing marijuana use. The Court concludes that this disputed evidence is not sufficient to find by a preponderance of the evidence that Mr. Shawda intentionally violated the conditions of his probation in regard to the "stalled" urine samples. Accordingly,

**IT IS HEREBY ORDERED** that Government Exhibit "2", the June 28, 2010 report from Alere Toxicology Services, is inadmissible, and the Government has therefore not met its burden to prove that Defendant used marijuana during his term of probation.

**IT IS FURTHER ORDERED** that the Government's Petition for Warrant for Offender Under Supervision (#20) is **denied** and that Defendant Shawda be immediately released from custody subject to the conditions of probation previously imposed by the Court on February 10, 2010.

DATED this 1st day of July, 2010.

_____
GEORGE FOLEY, JR.
U.S. MAGISTRATE JUDGE

11